**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JACK BLANKENSHIP<br>12600 Sable Park Drive<br>Apartment 103<br>Pineville, NC 28134 | )<br>)<br>)<br>)<br>) | CASE NO.<br><br>JUDGE: |
| -and- | )<br>) | |
| ELIZABETH LEACH<br>12600 Sable Park Drive<br>Apartment 103<br>Pineville, NC 28134 | )<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | **COMPLAINT FOR DAMAGES<br>AND INJUNCTIVE RELIEF** |
| MARK PORTER AUTOPLEX, INC.<br>c/o Chase Porter<br>42885 Cook Road<br>Pomeroy, Ohio 45769 | )<br>)<br>)<br>)<br>) | **JURY DEMAND ENDORSED<br>HEREIN** |
| Defendant. | )<br>)<br>)<br>) | |

Plaintiffs, Jack Blankenship and Elizabeth Leach (collectively, "Plaintiffs"), by and through undersigned counsel, as their Complaint against Defendant Mark Porter Autoplex, Inc. ("MPA"), states and avers the following:

**PARTIES, VENUE, & JURISDICTION**

1. Blankenship is a resident of Pineville, North Carolina.

2. At all times herein, Blankenship was acting in the course and scope of his employment.

3. Leach is a resident of Pineville, North Carolina.

4. At all times herein, Leach was acting in the course and scope of her employment.

5. MPA is a domestic corporation for profit that does business at 42411 Charles Chancey Drive, Pomeroy, Meigs County, Ohio 45769 ("GM Location").

6. MPA is and, at all times herein, was an employer within the meaning of R.C. § 4112.01 *et seq.*

7. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Plaintiffs are alleging a Federal Law Claim under Title VII of the Civil Rights Act of 1964, 28 U.S.C. § 2000e ("Title VII").

8. All material events alleged in this Complaint occurred in Meigs County, Ohio.

9. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 as Plaintiffs' state law claims are so closely related to their federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

11. Within 300 days of the conduct alleged below, Blankenship filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 532-2020-02176 against MPA ("Blankenship EEOC Charge").

12. Within 300 days of the conduct alleged below, Leach filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 532-2020-02161 against MPA ("Leach EEOC Charge").

13. On or about January 8, 2021, the EEOC issued and mailed a Notice of Right to Sue letter to Blankenship regarding the Charges of Discrimination brought by Blankenship against MPA in the Blankenship EEOC Charge.

14. On or about January 26, 2021, the EEOC issued and mailed a Notice of Right to Sue letter to Leach regarding the Charges of Discrimination brought by Leach against MPA in the Leach EEOC Charge.

15. Plaintiffs received their Right to Sue letters from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which have been attached hereto as Plaintiffs Exhibit A.

16. Plaintiffs have filed this Complaint within 90 days of the issuance of the Notice of Right to Sue letter.

17. Plaintiffs have properly exhausted their administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

18. Blankenship is a former employee of MPA.

19. On or about October 12, 2010, Blankenship began working for MPA.

20. MPA employed Blankenship as a sales associate.

21. At all times herein, Blankenship was qualified for the position of sales associate.

22. Leach is a former employee of MPA.

23. On or about January 27, 2019, Leach began working for MPA.

24. MPA employed Leach as a sales associate.

25. At all times herein, Leach was qualified for the position of sales associate.

26. MPA is a group of automobile dealerships.

27. At the GM Location, MPA sells Chevrolet, Buick, and GMC vehicles.

28. Blankenship worked at the GM Location.

29. Leach worked at the GM Location.

30. Chase Porter was the general manager at the GM Location.

31. Porter is the son of MPA's owner.

32. Porter was Blankenship's direct supervisor.

33. Porter was not involved in the decision to hire Blankenship.

34. Porter was Leach's direct supervisor.

35. Hollie Stanley was a sales associate at the GM Location.

36. Porter was Stanley's direct supervisor.

37. Porter sent sexually explicit text messages to Stanley ("Tawdry Texts").

38. Among the Tawdry Texts, Porter wrote to Stanley that he wanted to use "nipple clamps" on her.

39. Among the Tawdry Texts, Porter wrote to Stanley, "What talking about [sic] tearing the straps of your dress from your shoulders so that it falls to the ground then sinking my mouth on the side of your [sic] sucking and biting as I rip your bra then shove my hands down your front and rubbing you until you are good and wet and then slamming a finger inside of while my thumb rubs your clit then forcing you to your knees making you unbutton my pants and pull my pants down until my dick flops out and shoving the head into your mouth and holding your [sic] making you suck it deeper."

40. Among the Tawdry Texts, Porter wrote, "if you want somebody to talk dirty to you I can do that trust me I'm picturing fucking you until you couldn't stand over my desk" [sic].

41. In or about April 2019, Stanley showed Blankenship the Tawdry Texts.

42. In or about April 2019, Stanley told Blankenship that the Tawdry Texts were unwelcome.

43. In or about April 2019, Blankenship believed that the Tawdry Texts were unwelcome to Stanley.

44. In or about April 2019, Blankenship reasonably believed that the Tawdry Texts were unwelcome to Stanley.

45. In or about April 2019, Stanley told Blankenship that Porter was sexually harassing her.

46. In or about April 2019, Blankenship believed that Porter was sexually harassing Stanley.

47. In or about April 2019, Blankenship reasonably believed that Porter was sexually harassing Stanley.

48. In or about April 2019, Stanley showed Leach the Tawdry Texts.

49. In or about April 2019, Stanley told Leach that the Tawdry Texts were unwelcome.

50. In or about April 2019, Leach believed that the Tawdry Texts were unwelcome to Stanley.

51. In or about April 2019, Leach reasonably believed that the Tawdry Texts were unwelcome to Stanley.

52. In or about April 2019, Stanley told Leach that Porter was sexually harassing her.

53. In or about April 2019, Leach believed that Porter was sexually harassing Stanley.

54. In or about April 2019, Leach reasonably believed that Porter was sexually harassing Stanley.

55. Porter sexually harassed Stanley.

56. Blankenship opposed the sexual harassment of Stanley.

57. Blankenship opposed the perceived sexual harassment of Stanley.

58. Leach opposed the sexual harassment of Stanley.

59. Leach opposed the perceived sexual harassment of Stanley.

60. On or about May 3, 2019, Blankenship reported to Vincent Felts that Porter was sexually harassing Stanley ("Blankenship's Report of Harassment").

61. Felts was Finance Manager for MPA.

62. MPA has a policy against sexual harassment ("Sexual Harassment Policy").

63. MPA's Sexual Harassment Policy precludes retaliation against employees who complain about sexual harassment.

64. Alternatively, retaliation against employees who complain about sexual harassment is permitted by MPA.

65. MPA's Sexual Harassment Policy precludes intimidation against employees who complain about sexual harassment.

66. Alternatively, intimidation against employees who complain about sexual harassment is permitted by MPA.

67. MPA's Sexual Harassment Policy requires employees to report what they reasonably believe is a violation of the Sexual Harassment Policy.

68. MPA's Sexual Harassment Policy precludes retaliation against employees who report a violation of the Sexual Harassment Policy.

69. Alternatively, retaliation against employees who report a violation of the Sexual Harassment Policy is permitted by MPA.

70. MPA's Sexual Harassment Policy precludes intimidation against employees who report a violation of the Sexual Harassment Policy.

71. Alternatively, intimidation against employees who report a violation of the Sexual Harassment Policy is permitted by MPA.

72. The Tawdry Texts violate the Sexual Harassment Policy.

73. MPA has a policy to investigate reports of violations of its Sexual Harassment Policy.

74. An investigation should include interviewing the complainant.

75. An investigation should include interviewing the subject of the complaint.

76. An investigation should include interviewing the subject of the reported discrimination.

77. An investigation should include interviewing witnesses to the reported discrimination.

78. An investigation should include getting a written statement from the complainant.

79. An investigation should include getting a written statement from the subject of the complaint.

80. An investigation should include getting a written statement from the subject of the reported discrimination.

81. In response to Blankenship's Report of Harassment, MPA did not interview Blankenship.

82. In response to Blankenship's Report of Harassment, MPA did not interview Stanley.

83. In response to Blankenship's Report of Harassment, MPA did not interview Porter.

84. In response to Blankenship's Report of Harassment, MPA did not interview witnesses.

85. In response to Blankenship's Report of Harassment, MPA did not get a written statement from Blankenship.

86. In response to Blankenship's Report of Harassment, MPA did not get a written statement from Stanley.

87. In response to Blankenship's Report of Harassment, MPA did not get a written statement from Porter.

88. In response to Blankenship's Report of Harassment, MPA did not get a written statement from witnesses.

89. MPA did not investigate Blankenship's Report of Harassment.

90. MPA did not give Porter a verbal warning as a result of Blankenship's Report of Harassment.

91. MPA did not give Porter a written warning as a result of Blankenship's Report of Harassment.

92. MPA did not give Porter a final warning as a result of Blankenship's Report of Harassment.

93. MPA did not give Porter a suspension as a result of Blankenship's Report of Harassment.

94. MPA did not terminate Porter's employment as a result of Blankenship's Report of Harassment.

95. MPA did not discipline Porter at all as a result of Blankenship's Report of Harassment.

96. Felts told Porter about Blankenship's Report of Harassment.

97. Porter was in charge of assigning sales leads to sales associates.

98. Prior to Blankenship's Report of Harassment, Porter assigned sales leads to Blankenship.

99. After Blankenship's Report of Harassment, Porter stopped assigning sales leads to Blankenship ("Blankenship Sales Snubbing").

100. The Blankenship Sales Snubbing was an adverse action.

101. MPA paid Blankenship on a commission basis.

102. Because of the Blankenship Sales Snubbing, Blankenship got fewer sales than he got before the Blankenship Sales Snubbing.

103. Because of the Blankenship Sales Snubbing, Blankenship received less money from commissions than he received before the Blankenship Sales Snubbing.

104. Porter did the Blankenship Sales Snubbing intentionally.

105. Porter did the Blankenship Sales Snubbing willfully.

106. Porter knew that MPA paid Blankenship on a commission basis.

107. Porter knew that a reduction in Blankenship's sales would cause Blankenship to receive less money from commissions.

108. Porter did the Blankenship Sales Snubbing in retaliation for Blankenship's Report of Harassment.

109. Prior to Blankenship's Report of Harassment, MPA allowed Blankenship to set his own work schedule.

110. After Blankenship's Report of Harassment, MPA required Blankenship to work a schedule set by Porter ("Retaliatory Scheduling of Blankenship").

111. The Retaliatory Scheduling of Blankenship was an adverse action.

112. Porter made the decision to do the Retaliatory Scheduling of Blankenship.

113. MPA did the Retaliatory Scheduling of Blankenship intentionally.

114. MPA did the Retaliatory Scheduling of Blankenship willfully.

115. MPA did the Retaliatory Scheduling in retaliation for Blankenship's Report of Harassment.

116. In or about mid-July 2019, Leach reported to Felts that Porter was sexually harassing Stanley ("Leach's Report of Harassment").

117. In response to Leach's Report of Harassment, MPA did not interview Leach.

118. In response to Leach's Report of Harassment, MPA did not interview Stanley.

119. In response to Leach's Report of Harassment, MPA did not interview Porter.

120. In response to Leach's Report of Harassment, MPA did not interview witnesses.

121. In response to Leach's Report of Harassment, MPA did not get a written statement from Leach.

122. In response to Leach's Report of Harassment, MPA did not get a written statement from Stanley.

123. In response to Leach's Report of Harassment, MPA did not get a written statement from Porter.

124. In response to Leach's Report of Harassment, MPA did not get a written statement from witnesses.

125. MPA did not investigate Leach's Report of Harassment.

126. MPA did not give Porter a verbal warning as a result of Leach's Report of Harassment.

127. MPA did not give Porter a written warning as a result of Leach's Report of Harassment.

128. MPA did not give Porter a final warning as a result of Leach's Report of Harassment.

129. MPA did not give Porter a suspension as a result of Leach's Report of Harassment.

130. MPA did not terminate Porter's employment as a result of Leach's Report of Harassment.

131. MPA did not discipline Porter at all as a result of Leach's Report of Harassment.

132. Felts told Porter about Leach's Report of Harassment.

133. Prior to Leach's Report of Harassment, Porter assigned sales leads to Leach.

134. After Leach's Report of Harassment, Porter stopped assigning sales leads to Leach ("Leach Sales Snubbing").

135. The Leach Sales Snubbing was an adverse action.

136. MPA paid Leach on a commission basis.

137. Because of the Leach Sales Snubbing, Leach got fewer sales than she got before the Leach Sales Snubbing.

138. Because of the Leach Sales Snubbing, Leach received less money from commissions than she received before the Leach Sales Snubbing.

139. Porter did the Leach Sales Snubbing intentionally.

140. Porter did the Leach Sales Snubbing willfully.

141. Porter knew that MPA paid Leach on a commission basis.

142. Porter knew that a reduction in Leach's sales would cause Leach to receive less money from commissions.

143. Porter did the Leach Sales Snubbing in retaliation for Leach's Report of Harassment.

144. Prior to Leach's Report of Harassment, MPA allowed Leach to set her own work schedule.

145. After Leach's Report of Harassment, MPA required Leach to work a schedule set by Porter ("Retaliatory Scheduling of Leach").

146. The Retaliatory Scheduling of Leach was an adverse action.

147. Porter made the decision to do the Retaliatory Scheduling of Leach.

148. MPA did the Retaliatory Scheduling of Leach intentionally.

149. MPA did the Retaliatory Scheduling of Leach willfully.

150. MPA did the Retaliatory Scheduling of Leach in retaliation for Leach's Report of Harassment.

151. In or about September 2019, Blankenship requested four days off work, from October 5, 2019, to October 8, 2019 ("Blankenship's Vacation Request").

152. In or about September 2019, Porter approved Blankenship's Vacation Request.

153. Porter knew that Blankenship made Blankenship's Vacation Request because he had plans to be out of state.

154. In or about September 2019, Leach requested four days off work, from October 5, 2019, to October 8, 2019 ("Leach's Vacation Request").

155. In or about September 2019, Porter approved Leach's Vacation Request.

156. On or about September 30, Porter asked Stanley if she deleted the Tawdry Texts. ("Request to Delete Tawdry Texts")

157. On or about September 30, 2019, Stanley informed Porter that she did delete the Tawdry Texts.

158. On or about October 1, 2019, Porter scheduled Blankenship to work October 7, 2019 ("Last-Minute Scheduling of Blankenship").

159. On or about October 1, 2019, Porter scheduled Blankenship to work October 7, 2019.

160. On or about October 1, 2019, Porter knew that Blankenship had plans to be out of state on October 7, 2019.

161. October 7, 2019 was a did not work for Defendant on Mondays.

162. Porter did the Last-Minute Scheduling of Blankenship because he knew Blankenship had plans to be out of state.

163. Porter did the Last-Minute Scheduling of Blankenship because he knew Stanley deleted the Tawdry Texts.

164. The Last-Minute Scheduling of Blankenship was an adverse action.

165. Porter intentionally did the Last-Minute Scheduling of Blankenship.

166. Porter willfully did the Last-Minute Scheduling of Blankenship.

167. Porter knew that Blankenship would either have to miss work or cancel his travel plans as a result of the Last-Minute Scheduling of Blankenship.

168. On or about October 1, 2019, Porter scheduled Leach to work October 7, 2019 ("Last-Minute Scheduling of Leach").

169. On or about October 1, 2019, Porter scheduled Leach to work October 7, 2019.

170. On or about October 1, 2019, Porter knew that Leach had plans to be out of state on October 7, 2019.

171. Porter did the Last-Minute Scheduling of Leach because he knew Leach had plans to be out of state.

172. Porter did the Last-Minute Scheduling of Leach because he knew Stanley deleted the Tawdy Texts.

173. The Last-Minute Scheduling of Leach was an adverse action.

174. Porter intentionally did the Last-Minute Scheduling of Leach.

175. Porter willfully did the Last-Minute Scheduling of Leach.

176. Porter knew that Leach would either have to miss work or cancel her travel plans as a result of the Last-Minute Scheduling of Leach.

177. On or about October 1, 2019, Blankenship told Porter via phone that Plaintiffs were scheduled to work October 7, 2019, despite their approved vacation time.

178. On or about October 1, 2019, Porter refused to change the Last-Minute Scheduling of Plaintiffs.

179. On or about October 9, 2019, MPA terminated Plaintiffs employment ("Termination of Plaintiffs").

180. The Termination of Plaintiffs was an adverse action.

181. MPA has a progressive disciplinary policy ("Discipline Policy").

182. A verbal warning is the lowest level of discipline in the Discipline Policy.

183. Blankenship did not receive a verbal warning before the Termination of Blankenship.

184. Leach did not receive a verbal warning before the Termination of Leach.

185. A written warning is a higher level of discipline than a verbal warning in the Discipline Policy.

186. Blankenship did not receive a written warning before the Termination of Blankenship.

187. Leach did not receive a written warning before the Termination of Leach.

188. A termination is the highest level of discipline in the Discipline Policy.

189. MPA knowingly skipped progressive disciplinary steps in terminating Blankenship.

190. MPA knowingly skipped progressive disciplinary steps in terminating Leach.

191. MPA knowingly terminated Blankenship's employment.

192. MPA knowingly terminated Leach's employment.

193. MPA knowingly took an adverse action against Blankenship.

194. MPA knowingly took an adverse action against Leach.

195. MPA intentionally skipped progressive disciplinary steps in terminating Blankenship.

196. MPA intentionally skipped progressive disciplinary steps in terminating Leach.

197. MPA intentionally terminated Blankenship's employment.

198. MPA intentionally terminated Leach's employment.

199. MPA intentionally took an adverse action against Blankenship.

200. MPA intentionally took an adverse action against Leach.

201. MPA knew that skipping progressive disciplinary steps in terminating Blankenship would cause Blankenship harm, including economic harm.

202. MPA knew that skipping progressive disciplinary steps in terminating Leach would cause Leach harm, including economic harm.

203. MPA knew that terminating Plaintiffs would cause Plaintiffs harm, including economic harm.

204. MPA willfully skipped progressive disciplinary steps in terminating Plaintiffs.

205. MPA willfully terminated Plaintiffs employment.

206. MPA willfully took an adverse action against Plaintiffs.

207. As a direct and proximate result of MPA's conduct, Plaintiffs suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## **COUNT I:  RETALIATION IN VIOLATION OF TITLE VII**

208. Plaintiffs restate each and every prior paragraph of this complaint, as if it were fully restated herein.

209. Plaintiffs believed that Porter was sexually harassing Stanley.

210. Plaintiffs reasonably believed that Porter was sexually harassing Stanley.

211. Plaintiffs complained about Porter's sexual harassment of Stanley.

212. Plaintiffs complained about Porter's alleged sexual harassment of Stanley.

213. Subsequent to Blankenship's reporting of sexual harassment, MPA did the Blankenship Sales Snubbing.

214. Subsequent to Blankenship's reporting of sexual harassment, MPA did the Retaliatory Scheduling of Blankenship.

215. Subsequent to Blankenship's reporting of sexual harassment, MPA did the Last-Minute Scheduling of Blankenship.

216. Subsequent to Blankenship's reporting of sexual harassment, MPA terminated Blankenship's employment.

217. MPA's actions were retaliatory in nature based on Blankenship's opposition to the unlawful discriminatory conduct.

218. Subsequent to Leach's reporting of sexual harassment, MPA did the Leach Sales Snubbing.

219. Subsequent to Leach's reporting of sexual harassment, MPA did the Retaliatory Scheduling of Leach.

220. Subsequent to Leach's reporting of sexual harassment, MPA did the Last-Minute Scheduling of Leach.

221. Subsequent to Leach's reporting of sexual harassment, MPA terminated Leach's employment.

222. MPA's actions were retaliatory in nature based on Leach's opposition to the unlawful discriminatory conduct.

223. Pursuant to Title VII, it is an unlawful discriminatory practice to retaliate against an employee for opposing sexual harassment.

224. As a direct and proximate result of MPA's conduct, Plaintiffs suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

## **COUNT II: RETALIATION IN VIOLATION OF R.C. § 4112.01 *et seq.***

225. Plaintiffs restate each and every prior paragraph of this complaint, as if it were fully restated herein.

226. Plaintiffs believed that Porter was sexually harassing Stanley.

227. Plaintiffs reasonably believed that Porter was sexually harassing Stanley.

228. Plaintiffs complained about Porter's sexual harassment of Stanley.

229. Plaintiffs complained about Porter's alleged sexual harassment of Stanley.

230. Subsequent to Blankenship's reporting of sexual harassment, MPA did the Blankenship Sales Snubbing.

231. Subsequent to Blankenship's reporting of sexual harassment, MPA did the Retaliatory Scheduling of Blankenship.

232. Subsequent to Blankenship's reporting of sexual harassment, MPA did the Last-Minute Scheduling of Blankenship.

233. Subsequent to Blankenship's reporting of sexual harassment, MPA terminated Blankenship's employment.

234. MPA's actions were retaliatory in nature based on Blankenship's opposition to the unlawful discriminatory conduct.

235. Subsequent to Leach's reporting of sexual harassment, MPA did the Leach Sales Snubbing.

236. Subsequent to Leach's reporting of sexual harassment, MPA did the Retaliatory Scheduling of Leach.

237. Subsequent to Leach's reporting of sexual harassment, MPA did the Last-Minute Scheduling of Leach.

238. Subsequent to Leach's reporting of sexual harassment, MPA terminated Leach's employment.

239. MPA's actions were retaliatory in nature based on Leach's opposition to the unlawful discriminatory conduct.

240. Pursuant to R.C. § 4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

241. As a direct and proximate result of MPA's conduct, Plaintiffs suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

**<u>DEMAND FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully requests that this Honorable Court grant the following relief:

(a) Issue an order requiring MPA retroactively to restore Plaintiffs to the positions to which they were entitled by virtue of their application and qualifications, and expunge their personnel files of all negative documentation;

(b) An award against MPA of compensatory and monetary damages to compensate Plaintiffs for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against MPA in an amount in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Plaintiffs' claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Trisha Breedlove*_____
Trisha Breedlove (0095852)
Paul Filippelli (0097085)
**THE SPITZ LAW FIRM, LLC**
1103 Schrock Road, Suite 307
Columbus, Ohio 43229
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com
Email: paul.filippelli@spitzlawfirm.com
*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiffs demand a trial by jury by the maximum number of jurors permitted.


/s/ Trisha Breedlove
Trisha Breedlove (0095852)
Paul Filippelli (0097085)